[Civ. No. 48809. Second Dist., Div. Five. Dec. 23, 1976.]

LOIS N. PATILLO et al., Plaintiffs and Appellants, v.
RUTH NORRIS et al., Defendants and Respondents.

---

**COUNSEL**

Burg & Farnham and Charlotte Farnham for Plaintiffs and Appellants.

Mackey & Klein, Stuart L. Brody, Olney, Levy, Kaplan & Tenner and Arthur D. Warren for Defendants and Respondents.

---

**OPINION**

**ASHBY, J.**—This case involves determining the rights of the parties when a man with two wives and a child dies intestate, having designated a neighbor lady as the beneficiary of his employment-related life insurance policy and union pension fund death benefit.

The record on appeal in this case is sketchy and in some respects inadequate. None of the pleadings is contained in the clerk's transcript. An engrossed settled statement is substituted for a reporter's transcript of the proceedings. A summary of the evidence was contained in the closing trial brief of one of the parties and was adopted by the trial court as an accurate statement of the evidence. It appears that the case arises out of two interpleader actions by the Prudential Insurance Company of America and the Carpenters Pension Trust Fund of Southern California. The purpose of the proceeding was to determine who was entitled to the proceeds, in the sum or $10,488 of a Prudential insurance policy on the life of David Oliver Patillo, deceased, and of his preretirement death benefit, in the amount of $8,784, in the Carpenters Pension Trust Fund. The parties claiming interest in the proceeds are: Clydia Patillo, the first wife of David; Lois N. Patillo, the second wife, who sues individually and as guardian ad litem for Katherine Patillo, a minor, the adopted daughter of Lois and David; and Ruth Norris, the designated beneficiary.

The trial court held that Ruth was entitled to half the proceeds, and that Clydia, as legal spouse, and Lois, as putative spouse, should share equally in the other half. The court further stated that Katherine was a "pretermitted heir" with a possible claim against David's estate under Probate Code section 90 and for child support, but that such claims would have to be filed against the estate. Lois and Katherine appeal from this judgment.

We set forth the chronology of events based upon the summary of the evidence which was adopted by the trial court.

*September 16, 1942*: Clydia married David.

*December 24, 1949*: Clydia and David separated. Clydia went to Texas, and lived apart from David for 20 years. Clydia testified the marriage was never terminated by divorce or dissolution.

*March 11, 1951*: Lois entered a valid ceremonial marriage with David at Yuma, Arizona. At the time of obtaining the marriage license, David executed an oath stating that he was not married, and David told Lois he was divorced from Clydia. Lois lived with David until August 2, 1969.

*1949 to 1969*: For these 20 years Clydia did not correspond with David and lost all contact with him.

*1956 or 1957*: Clydia went to the home of David and Lois, and left a note for David asking him to call her, signed, "Your wife, Clydia." Clydia did not see David or Lois on that occasion. Lois found the note and asked David's sister, Jessie Gentry, about it. Mrs. Gentry told her that Clydia claimed to be still married to David, and Lois replied, "That's too bad. There is nothing she can do about it now."

*August 9, 1963*: David and Lois adopted Katherine. During the course of the adoption, the Department of Adoptions "verified" that Lois and David were legally married and the adoption decree so specified.

*August 2, 1969*: Lois and David separated. Lois left the family home out of fear for her life when David pointed a gun at her, told her to leave, and said that he would kill her if she took Katherine with her. Katherine continued to live with David until January 1971.

*Sometime in 1969*: David attended a funeral in Texas and got in touch with Clydia through her uncle. David later sent her a plane ticket to Los Angeles.

*December 24, 1969*: Exactly 20 years after their separation, Clydia returned to David's house in Los Angeles and they "reconciled." She lived at the house with David and Katherine, but slept in the front room.

*February 19, 1970*: Clydia returned to Texas.

*Easter 1970*: Clydia returned to David's home in Los Angeles.

*Sometime between Easter and the latter part of 1970*: Clydia moved out, and got an apartment of her own. She continued to visit David. "I alternated between my apartment and his house. I would stay two or three days. He was out of work. He drank all day and walked all night. I was working and had to get my rest."

*Sometime in 1971*: Clydia and David had another "falling apart."

*October 19, 1971*: Lois filed suit for divorce. At no time subsequent to her separation from David in August 1969 did he provide support for her. In January 1971 he permitted Katherine to live with Lois, but he provided no child support for Katherine. On November 11, 1971, an order to show cause was issued ordering David to pay $10 per week child support. No interlocutory judgment of divorce was ever obtained.

*September 16, 1972*: David died.

Ruth was a neighbor of David's; she showed him various kindnesses and performed some services for him gratuitously, with no expectation of payment. He never told her he was going to name her as a beneficiary.

The record contains no comparable summary of evidence detailing the nature of the insurance policy and the death benefits. We infer from the trial briefs that both were fringe benefits provided by David's employer without any contribution by David. It seems to have been agreed that both funds were attributable to David's employment and were therefore community property to the extent that a community existed. However, the trial court made no attempt to allocate any portions of the funds to any particular periods of employment. According to the trial briefs, the pension fund was created on September 14, 1959, with credit given for

prior union membership. The insurance policy was issued on March 27, 1970. According to a trial brief, David changed the beneficiary twice as to both benefits, designating Clydia on April 13, 1970, and Ruth on March 27, 1972.

Relying upon the principle that as the designated beneficiary Ruth could not defeat the community property rights of David's spouse(s), the trial court held that Ruth was entitled to one-half of the proceeds. The court found that Clydia was David's legal spouse and that Lois was his putative spouse and that each had a community property interest with David in the proceeds. The court thus divided the other half equally between Clydia and Lois. In making its ruling, the trial court refused to give retroactive effect to the 1971 amendment of Civil Code section 5118, which provides that: "The earnings and accumulations of a spouse . . . while living separate and apart from the other spouse, are the separate property of the spouse."

## DISCUSSION

Lois[1] raises two basic arguments for reversal of the judgment: (1) That the court erred in making any award to Clydia, because the record does not support a finding that Clydia was David's legal wife and (2) that the court erred in failing to apply Civil Code section 5118 to that portion of the funds attributable to the period David was living separate from Clydia and Lois.

Lois relies upon the rule that "when a person has entered into two successive marriages, a presumption arises in favor of the validity of the second marriage, and the burden is upon the party attacking the validity of the second marriage to prove that the first marriage had not been dissolved by the death of a spouse or by divorce or had not been annulled at the time of the second marriage." (*Estate of Smith*, 33 Cal.2d 279, 281 [201 P.2d 539]; *Vargas* v. *Superior Court*, 9 Cal.App.3d 470, 473 [88 Cal.Rptr. 281].) ■ The primary basis of this presumption is the policy that the person entering the second marriage is not presumed to have committed the crime of bigamy. (*Estate of Smith*, 9 Cal.3d 74, 81 [106 Cal.Rptr. 774, 507 P.2d 78].) ■ The burden of overcoming that presumption is said to be a heavy one, since it involves proving a negative fact, that is, that there has been no divorce. (*Estate of Atherley*,

[1]As the trial court noted, Katherine's alleged claims against her father's estate are not properly involved in this proceeding.

44 Cal.App.3d 758, 765-766 [119 Cal.Rptr. 41]; *Vargas* v. *Superior Court, supra,* 9 Cal.App.3d at p. 477.) However, the presumption is rebuttable, and may be overcome upon a consideration of the attending facts and circumstances and such inferences as fairly and reasonably flow therefrom. (*Estate of Smith, supra,* 33 Cal.2d 279, 281.) The question is whether there is substantial evidence to support the trial court's finding. (*Id.*)

■ Here, although Clydia failed to show she had made any search of court records for a divorce judgment (see *Vargas* v. *Superior Court, supra,* at pp. 475-476), there was some evidence to support the conclusion she was still David's legal wife. She testified that there had never been a divorce; she wrote him a note in 1956 or 1957 referring to herself as his wife; and, significantly, David apparently welcomed her back into his home in December 1969 after his separation from Lois. We cannot say there is no substantial evidence to support the trial court's finding.[2]

Lois also argues that Clydia should be estopped, by her 20-year absence without contact with David, to claim that she remained his legal wife. (See *Estate of Atherley, supra,* 44 Cal.App.3d 758, 764.) *Atherley* states, however, that estoppel applies only to prevent a person from asserting a right where it would be unconscionable to allow her to do so. Here, although Clydia was gone for 20 years, she did return to David's home after his separation from Lois, and lived with him for a part of the time until his death. Because of our ruling on Lois's second argument, *infra,* that Civil Code section 5118 prevents Clydia's claiming any community property interest attributable to her 20-year separation from David, the circumstances do not equitably require application of the doctrine of estoppel.

■ Lois correctly contends that the trial court erred in refusing to consider the applicability of Civil Code section 5118 except for the period after March 4, 1972, the effective date of the statute. Subsequent to the trial court's ruling, our Supreme Court held "that amended section 5118 governs all property rights, whenever acquired, that have not been finally adjudicated by a judgment from which the time to appeal has lapsed." (*In re Marriage of Bouquet,* 16 Cal.3d 583, 594 [128 Cal.Rptr. 427, 546 P.2d 1371].)[3]

---

[2]There is no merit to Lois' claim that the "verification" of the validity of Lois' marriage at the time of the adoption is binding on Clydia in this proceeding.

[3]Clydia's attempt to distinguish *Bouquet,* and to analogize this case to that of a testator who intends the law at the time of the making of his will to apply, is specious.

The basic principle involved in the case of a married man who designates someone other than his wife as the named beneficiary of insurance or pension benefits is that, to the extent the premiums were paid with community funds or the benefits were earned by the husband from his employer during the marriage, on his death the wife is entitled to set aside the gift made to the named beneficiary without consideration and without her consent, to the extent of one-half of the community property interest. (*Tyre* v. *Aetna Life Ins. Co.,* 54 Cal.2d 399, 404 [6 Cal.Rptr. 13, 353 P.2d 725]; *Sieroty* v. *Silver,* 58 Cal.2d 799, 803 [26 Cal.Rptr. 635, 376 P.2d 563]; *Polk* v. *Polk,* 228 Cal.App.2d 763, 781-782 [39 Cal.Rptr. 824]; see *Benson* v. *City of Los Angeles,* 60 Cal.2d 355, 359 [33 Cal.Rptr. 257, 384 P.2d 649].) The theory is that the husband has the power to give his half of the community property to the named beneficiary, but not the wife's half. (*Polk* v. *Polk, supra* at p. 782.) Obviously, to the extent that the premiums were paid with the husband's separate property, or the pension benefits earned while the husband was separated from the wife, the husband is perfectly free to name the beneficiary without regard to the wife's wishes. Where the proceeds are attributable in part to community property and in part to separate property, it is the duty of the trial court to make an allocation. (*Polk* v. *Polk, supra* at pp. 782-785.)

The instant case involves the claims of the named beneficiary and two wives rather than one, but Civil Code section 5118 provides the basis for apportioning the various rights involved. This is not a case of a man leading a double life, maintaining two households and two wives simultaneously. (Cf. *Estate of Vargas,* 36 Cal.App.3d 714 [111 Cal.Rptr. 779].) Here David lived with each wife only after he had separated from the other. The community property claims of each wife[4] thus did not actually overlap; they merely applied to different time periods in David's life.

The trial court should have determined the extent to which the funds were attributable to the various periods in David's life. The record on appeal contains no findings and virtually no evidence as to the source of these funds in terms of David's employment. The pension fund is said to have been created on September 14, 1959, but with "credit" for prior union membership, which implies that the pension was in part attributa-

---

[4]The trial court found that Lois was a putative spouse, *i.e.,* she in good faith believed in the validity of her marriage. Contrary to Clydia's contention, the record supports this finding. Therefore Lois had a quasi-marital property interest. (See *Estate of Vargas, supra* 36 Cal.App.3d 714, 717; Civ. Code, § 4452.)

ble to employment prior to that date. The Prudential insurance policy is said to have been "issued" on March 27, 1970, but the record on appeal fails to show when this policy was earned or how it was paid for.

If given adequate information as to the periods of employment to which the funds were attributable, and if it had correctly anticipated the holding of *In re Marriage of Bouquet, supra,* the trial court should have determined the rights of the parties along the following lines:

*9-16-42 to 12-24-49*: Any portion of the funds attributable to David's employment during this period would be distributed one-half to Ruth, as David's share of community property, and one-half to Clydia, as her share of community property.

*12-24-49 to 3-11-51*: Any portion of the funds attributable to David's employment during this period would be distributed all to Ruth, as David's separate property, because he was separated from Clydia and not yet married to Lois.

*3-11-51 to 8-2-69*: The portion of the funds attributable to David's employment during this period would be distributed one-half to Ruth as David's share of quasi-marital property, and one-half to Lois as her putative spouse's share of quasi-marital property. No portion would go to Clydia, because she was separated from David throughout this period.

*8-2-69 to 12-24-69*: The portion of the funds attributable to David's employment during this period would be distributed all to Ruth as David's separate property, because he was separated from both Clydia and Lois during this period.[5]

*12-24-69 to ?*: Clydia resumed living with David at this time. It seems clear that at some later point in time Clydia separated from David again. The trial court erred in making no finding as to the date of the subsequent separation. Any portion of the funds attributable to David's employment during this period would be distributed one-half to Ruth as David's share of the community property, and one-half to Clydia as her share. No portion would be distributed to Lois because she was separated from David.

---

[5]Lois cites no authority for her argument that Civil Code section 5118 is inapplicable to her because she separated from David at the point of a gun. Section 5118 makes no reference to the cause of the separation.

*? to 9-16-72*: Any portion of the funds attributable to David's employment after the subsequent separation from Clydia and up to his death would be distributed all to Ruth, as David's separate property, David having separated from both Clydia and Lois during this period.

The inadequacy of the record makes it impossible for us to make this apportionment and therefore a reversal and retrial on the issue of apportionment will be required. (*Polk* v. *Polk, supra,* 228 Cal.App.2d at p. 785.)

■ We note that if any significant portion of the funds is attributable to David's employment when he was separated from both Clydia and Lois, it is possible that application of the above formula would give Ruth more than one-half of the proceeds, *i.e.,* more than she was awarded by the court in this trial. Such result, if appropriate, is not precluded by the fact that Ruth did not appeal. The rule that a judgment becomes final as against a nonappealing party even though reversed on the appeal of another party, is not applied where portions of the judgment adverse to a nonappealing party are so interwoven with the whole that appeal from a part affects the other parts; in such a situation, the appellate court can reverse the entire judgment if it is necessary to do justice. (*Blache* v. *Blache,* 37 Cal.2d 531, 538 [233 P.2d 547]; *Estate of McDill,* 14 Cal.3d 831, 840-841 [122 Cal.Rptr. 754, 537 P.2d 874].) This case involves apportionment of a fixed fund among the parties. If more than one-half of the fund was subject to David's testamentary disposition, there is no reason Clydia or Lois should get a windfall to which they are not entitled, merely because Ruth did not appeal. (*Estate of McDill, supra* at p. 841; *Estate of Murphey,* 7 Cal.2d 712, 717 [62 P.2d 374].)

The judgment is reversed and the cause remanded for further proceedings consistent with the views expressed in this opinion.

Stephens, Acting P. J., and Hastings, J., concurred.